# Exhibit A

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
Julia K. Venditti (State Bar No. 332688)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com
         jvenditti@bursor.com

*Attorneys for Plaintiff and the Putative Class*

Electronically FILED by
Superior Court of California,
County of Los Angeles
3/04/2026 3:35 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By G. Delgado, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| LANCE DUTCHER, individually and on behalf of all other persons similarly situated,<br><br>                               Plaintiff,<br><br>              v.<br><br>FLOCK GROUP INC., d/b/a FLOCK SAFETY, and DOES 1 through 100, inclusive,<br><br>                        Defendants. | Case No. 26STCV07141<br><br>CLASS ACTION<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Ex. A
p.8

1

Plaintiff Lance Dutcher ("Plaintiff") brings this action on behalf of himself, and all others similarly situated against Defendants Flock Group Inc. and Does 1 through 100, inclusive (collectively, "Flock," "Flock Safety," or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

### NATURE OF THE ACTION

1. This is a putative class action against Flock for violations of Plaintiff's and other Class Members' right to privacy and protection of personally identifiable information ("PII") under Civil Code § 1798 ("§ 1798") and other relevant consumer protection statutes and constitutional provisions.

2. Automated License Plate Reader ("ALPR") systems are highspeed cameras— usually with accompanying software—that record, capture, analyze and store information about vehicles' make, model, and license plate numbers.  Oftentimes, these cameras capture photographs of an entire vehicle as it passes, as well as its driver and passengers.  The date and time that the photograph is taken is also captured.

3. ALPRs are indiscriminate: they capture photographs of any vehicles that pass by the camera.[1]  This means that, as more ALPRs are installed over wider geographic areas, a picture of a car's—and by extension, its driver's—activity can form over time.  For example, "ALPR technology can be used to target drivers who visit sensitive places such as health centers, immigration clinics, gun shops, union halls, protests, or centers of religious worship."[2]

4. In response to concerns that "[t]he right to privacy is being threatened by the indiscriminate collection, maintenance, and dissemination of personal information" and that "[t]he increasing use of computers and other sophisticated technology has greatly magnified [that] risk," the California legislature passed § 1798 intending to limit the collection, use, and dissemination of ALPR data.  *See* Civ. Code § 1798.1(a)-(b).

---

[1] *See* Electronic Frontier Foundation, *Data Driven: What Is ALPR?*, https://www.eff.org/pages/what-alpr (last accessed Mar. 4, 2026).

[2] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

5. Defendant Flock Safety, founded in 2017, is a nationwide, private vendor of ALPR cameras ("Flock Cameras") and accompanying software that allows for the analysis of its cameras' data. In 2022, Flock ALPR cameras were present in 1,400 US cities.[3] In 2024, that number grew to 4,000 cities. As of 2025, there are well over 100,000 Flock cameras installed in the United States.[4]

6. Flock sells, uses, installs, implements and maintains the Flock Cameras, which are ALPR systems that capture the license plate information, location, date, and time—and upon information and belief, driver and passenger information—of vehicles across the State of California.

7. Further, Flock provided to third parties and maintained, without consumers' authorization or notice, ALPR systems that captured the license plate information, location, date, and time as Plaintiff and the Class Members drove and/or parked their vehicles in the view or vicinity of the Flock Cameras. Here, for instance, Plaintiff parked his vehicle in the parking lot of multiple Home Depot brick-and-mortar stores, which features Flock Cameras that capture consumers' ALPR data,[5] including the parking lot of a Home Depot store located at 24451 Crenshaw Blvd., Torrance, California 90505, on September 14, 2025, and more recently in the parking lot of a Home Depot located at 14603 Ocean Gate Ave, Hawthorne, California 90250, on December 10, 2025. Flock's ALPR policy was not publicly posted or conspicuously available in writing at these Home Depot locations, nor is it publicly posted or conspicuously available in other places where the Flock Cameras are installed or maintained throughout California, in contravention

---

[3] *See* ACLU, *Fast-Growing Company Flock is Building a New AI-Driven Mass-Surveillance System* (Mar. 3, 2022), https://www.aclu.org/wp-content/uploads/publications/flock_1.pdf.

[4] *See* Malwarebytes Labs, *What the Flock is happening with license plate readers?* (Nov. 20, 2025), https://www.malwarebytes.com/blog/privacy/2025/11/what-the-flock-is-happening-with-license-plate-readers (last accessed Mar. 4, 2026).

[5] Flock Cameras are installed in the parking lots and stores of all Home Depot brick-and-mortar locations in the country—including at the over 230 Home Depot locations in California, as well as the parking lots of all Lowe's brick-and-mortar locations (including over 100 stores in California), malls owned by Simon Property Group (including more than 20 malls in California), and numerous other locations throughout California. There are thousands of Flock cameras at private and public locations throughout California.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Ex. A    3
p.10

of Cal. Civ. Code § 1798.90.51(b)(1) and/or Cal. Civ. Code § 1798.90.53(b)(1).

8.    Flock's lack of written notice means that reasonable drivers, like Plaintiff, drove and/or parked his vehicle in the view or vicinity of the Flock Cameras without knowing his PII would be captured and stored, and thereafter shared with unauthorized third parties.  Had Plaintiff, and all other similarly situated drivers, known that through the Flock Cameras Defendant provided, implemented, utilized and maintained ALPR systems that captured their PII—and that Defendant and its ALPR systems did not properly safeguard access to or disclosure of their PII—they would have avoided those locations containing a Flock Camera to the best of their ability, or at least have been afforded the opportunity to make an informed decision about the collection and disclosure of their PII by Flock.

9.    Defendant maintains and stores massive amounts of data captured from its system of Flock Cameras across the State of California, and it allows unauthorized, improper, and unprotected access to that data.

10.    Unauthorized users and/or accessors of Flock's California ALPR data are predominantly federal and/or out-of-state agencies, despite the fact that Cal. Civ. Code §§ 1798.90.5, *et seq.*, specifically forbids Flock from sharing Californians' ALPR data with these types of agencies.  *See* Cal. Civ. Code § 1798.90.55(b) ("A public agency shall not sell, share, or transfer ALPR information, except to another public agency, and only as otherwise permitted by law.").

11.    Interpreting Cal. Civ. Code § 1798.90.55 as an explicit prohibition against sharing Californians' ALPR data with federal agencies and out-of-state agencies is nothing novel.  In October 2025, Attorney General Rob Bonta brought a lawsuit against the City of El Cajon for "its refusal to comply with state law prohibiting the sharing of license plate data with federal and out-of-state law enforcement agencies."[6]  In that suit, Attorney General Bonta explained that "Senate

---

[6] State of California Department of Justice, *Press Release: Attorney General Bonta Sues El Cajon for Illegally Sharing License Plate Data with Out-of-State Law Enforcement* (Oct. 3, 2025), https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-el-cajon-illegally-sharing-license-plate-data-out.

Bill (SB) 34, codified as Civil Code section 1798.90.5 *et. seq.* … prohibits California's state and local law enforcement agencies from sharing ALPR data with federal and out-of-state agencies, where the data's use is beyond the reach of California's oversight and regulation."[7]

12.     Specifically, Attorney General Bonta clarified that "a 'public agency' is defined as 'the state, any city, county, or city and county, or any agency or political subdivision of the state or a city, county, or city and county, including, but not limited to, a law enforcement agency.' (*Id.*, at § 1798.90.5, subd. (f).)  Thus, California's state and local law enforcement agencies are prohibited from sharing ALPR data with out-of-state and federal law enforcement agencies."[8]

13.     Plaintiff asserts claims on behalf of himself, and all others similarly situated for: (i) unauthorized federal agency (and out-of-state agency) access and use of ALPR information, and (ii) failures to implement code compliant privacy policies that are available to the public in writing.

**PARTIES**

14.     Plaintiff Lance Dutcher is a citizen of California, residing in Redondo Beach, California.  Plaintiff parked his vehicle in the parking lot of a Home Depot brick-and-mortar store on several occasions during the relevant period, including at 24451 Crenshaw Blvd., Torrance, California 90505, on September 14, 2025, and more recently at 14603 Ocean Gate Ave, Hawthorne, California 90250, on December 10, 2025.  In doing so, Plaintiff's data was obtained by Flock through the Flock Cameras using Flock's ALPR technology, and was subsequently collected, stored, and transmitted at the Home Depot parking lot located at 24451 Crenshaw Blvd. and 14603 Ocean Gate Ave.

15.     Defendant Flock Group, Inc. ("Flock") is a Delaware corporation with its principal address at 1160–1170 Howell Mill Road NW, Suite 210, Atlanta, Georgia 30318.  At all relevant times, Flock owned and/or operated ALPR equipment and systems that captured Plaintiff's and Class Members' license plate numbers at 24451 Crenshaw Blvd., Torrance, California 90505, and

---

[7] *Id.*

[8] *See People of California v. City of El Cajon, et al*, Case No. 25CU053437C (Sup. Ct., San Diego Cty., Oct. 3, 2025), *available at* https://oag.ca.gov/system/files/attachments/press-docs/El%20Cajon%20Complaint%20-%20Filed%2010.3.25.pdf.

14603 Ocean Gate Ave, Hawthorne, California 90250.

16.    Plaintiff is unaware of the true identities and capacities of fictitiously named defendants designated as Does 1—100 but will amend this complaint or any subsequent pleading when their identities and capacities have been ascertained according to proof.  On information and belief, every Doe Defendant is in some way responsible for the acts and conduct of the other defendants herein, and each Doe was, and is, responsible for the injuries, damages, and harm incurred by Plaintiff.  Each reference in this complaint to "Defendant," or a specifically named defendant, refers also to Flock and those unknown parties sued under fictitious names.

**JURISDICTION AND VENUE**

17.    The Court has personal jurisdiction over Defendant Flock Safety because it purposefully operates ALPR cameras in the state of California, and sold its ALPR cameras to ALPR end-users in the State of California.

18.    This is a class action brought pursuant to Code of Civil Procedure § 382, and this Court has subject matter jurisdiction over Plaintiff's claims because the amount in controversy exceeds the Court's jurisdictional minimum.

19.    Venue is proper under Code of Civil Procedure§ 395(a), 395.5, and Civil Code § 1780(c) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this county.

**FACTUAL ALLEGATIONS**

I.    **Overview Of ALPR Camera Use**

20.    ALPR systems are a type of computer-controlled camera system that "automatically capture[s] all license plate numbers that come into view, along with the location, date, and time."[9]

21.    They are often used in the form of "mobile units attached to police vehicles or stationary/fixed units that are mounted on utility poles, traffic lights, billboards, bridges, etc."[10]

[9] Electronic Frontier Foundation, *Automated License Plate Readers* (last updated Oct. 1, 2023), https://sls.eff.org/technologies/automated-license-plate-readers-alprs.

[10] John A. Shjarback, et al., *An Evaluation of a Major Expansion in Automated License Plate Reader (ALPR) Technology*, 8(2) JUSTICE EVAL. J. 225–242 (2025), *available at* https://www.tandfonline.com/doi/full/10.1080/24751979.2025.2473363.

"The data, which includes photographs of the vehicle and sometimes its driver and passengers, is then uploaded to a central server."[11]

22.     ALPR technology is not new.  It has existed in some form since at least the 1970s but rose to prevalence in the United States starting in 2009.

23.     The primary users of ALPRs are local/municipal law enforcement agencies, county/sheriff's offices, and state police/highway patrol.[12]

24.     But ALPR use is not limited to law enforcement agencies.  ALPR systems are also implemented by private entities, including in parking lots and garages, homeowners' associations, gated communities, and shopping malls.

25.     "ALPR data is gathered indiscriminately, collecting information on millions of ordinary people.  By plotting vehicle times and locations and tracing past movements, police can use stored data to paint a very specific portrait of drivers' lives, determining past patterns of behavior and possibly even predicting future ones—in spite of the fact that the vast majority of people whose license plate data is collected and stored have not even been accused of a crime."[13]

26.     This data is often stored on the ALPR server indefinitely, without the person whose data is being stored having any knowledge of the fact.

27.     Privacy and civil rights organizations have been sounding the alarm on these types of surveillance systems for years.

28.     They warn that this rapidly developing technology, initially used for proper law enforcement and community protection, will ultimately reach beyond its original purpose.

29.     Specifically, they warn that this technology can be used to target protestors,

---

[11]  Electronic Frontier Foundation, *Automated License Plate Readers* (last updated Oct. 1, 2023), https://sls.eff.org/technologies/automated-license-plate-readers-alprs.

[12] *See* John A. Shjarback, et al., *An Evaluation of a Major Expansion in Automated License Plate Reader (ALPR) Technology*, 8(2) JUSTICE EVAL. J. 225–242 (2025), *available at* https://www.tandfonline.com/doi/full/10.1080/24751979.2025.2473363.

[13] Electronic Frontier Foundation, *Data Driven: What Is ALPR?*, https://www.eff.org/pages/what-alpr (last accessed Mar. 4, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

dissidents,[14] activists and even individuals who are the subject of personal vendettas.[15]

## II.   Flock's Surveillance System

30.    Flock was founded in 2017 by CEO Garrett Langley, who came up with the idea for the company after he became the victim of a property crime in Atlanta, Georgia.

31.    Flock sells both hardware—in the form of license plate readers, video cameras and drones—and software—in the form of its FlockOS, Flock Nova, Flock 911, and Flock FreeForm systems.

32.    Flock's license plate reader (LPR) cameras are part of its "LPR Camera Family."

33.    The LPRs come in "standard" (two lane roads and driveways), "long-range" (high-speed vehicles on highways), "trailer" (temporary coverage for events), and "flex" (short-term, movable coverage) versions.

34.    These LPRs make up what Flock calls its National LPR Network. According to its own data, Flock's National LPR Networks facilitates *20 billion* reads of license plates per month. The network operates across 49 states, covers 5,000+ communities, and works with 4,800+ law enforcement agencies.

35.    As of November 2025, there were "well over 100,000 Flock cameras installed in the United States ….  To put this in perspective, that's one Flock camera for every 4,000 US citizens. And each camera tracks twice as many vehicles on average with no set limit."[16]

36.    The National LPR Network is mainly for law enforcement use, but Flock also runs a private counterpart to this national database of Americans' vehicle information: the Flock Business

---

[14] *See* Electronic Frontier Foundation, *Flock Safety and Texas Sheriff Claimed License Plate Search Was for a Missing Person. It Was an Abortion Investigation.* (Oct. 7, 2025), https://www.eff.org/deeplinks/2025/10/flock-safety-and-texas-sheriff-claimed-license-plate-search-was-missing-person-it (last accessed Mar. 4, 2026).

[15] *See* WKRC/Local 12, *Police chief gets caught using license plate cameras to track his ex-girlfriend 228 times* (Aug. 18, 2024), https://local12.com/news/nation-world/police-chief-gets-caught-using-license-plate-cameras-to-track-his-ex-girlfriend-228-times-arrests-charges-probation-flock-safety-follow-stalk-new-boyfriend-broke-up-out-of-town-misuse.

[16] Malwarebytes Labs, *What the Flock is happening with license plate readers?* (Nov. 20, 2025), https://www.malwarebytes.com/blog/privacy/2025/11/what-the-flock-is-happening-with-license-plate-readers (last accessed Mar. 4, 2026).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Network.

37.    According to a press release issued by Flock, "For years, our law enforcement customers have used the power of a shared network to identify threats, connect cases, and reduce crime …. Now, we're extending that same network effect to the private sector[.]"[17]  The Flock Business Network "formalizes and secures" businesses' data sharing on retail theft, "enabling organizations to opt into private, permission-controlled partnerships with trusted peers in their community or industry."[18]

38.    At least 1,000 businesses rely on Flock's technology as of 2025.[19]

39.    In other words, there is a sprawling network of Flock ALPR cameras installed across the United States that take pictures of millions of Americans' vehicles as they drive to and from both commercial business and public streets alike.

40.    To store the information captured by these cameras, Defendant Flock, created, maintained, operated or facilitated at least two data storage networks—the National LPR Network and the Flock Business Network—that offer nationwide access to Americans' license plate data and PII.

**III.    Defendant Flock's Documented Lack Of Data Security Protocols**

41.    If the National LPR Network and the Flock Business Network were used solely for their original purpose—solving crimes through regulated law enforcement channels—then such technology would pose no risk to the everyday American.

42.    But despite Flock's assurances, its technology has led to alarming consequences. Flock Safety has been in the news multiple times for its hidden monitoring of thousands of Americans, and for overreaches of its nationwide surveillance network.

---

[17] GlobeNewswire, *Flock Launches First-Ever Business Network to Strengthen Private Sector Security Collaboration* (Jun. 23, 2025), https://www.globenewswire.com/news-release/2025/06/23/3103700/0/en/Flock-Launches-First-Ever-Business-Network-to-Strengthen-Private-Sector-Security-Collaboration.html.

[18] *Id.*

[19] *See* Flock Safety, *Blog Post: The Power of Connected Intelligence* (Sep. 18, 2025), https://www.flocksafety.com/blog/the-power-of-connected-intelligence.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

43.    For example, Flock has been criticized for allowing "more than 50 federal, state, and local agencies" to run "hundreds of searches through Flock's national network of surveillance data in connection with protest activity" where "law enforcement specifically targeted known activist groups."[20]

44.    Flock was revealed to have allowed federal agencies "side-door access" to its surveillance tools despite not "hav[ing] a formal contract" with those agencies.  Specifically, "more than 4,000 nation and statewide lookups by local and state police [were] done either at the behest of the federal government or as an 'informal' favor to federal law enforcement, or with a potential immigration focus."  Put differently, "while Flock does not have a contract with ICE, the agency sources data from Flock's cameras by making requests to local law enforcement."[21]

45.    It was revealed in August 2025 that "Customs and Border Protection (CBP) regularly searched more than 80,000 Flock automated license plate reader (ALPR) cameras, according to data released by three police departments ….  One of the police departments … said it did not know or understand that it was sharing data with CBP."[22]

46.    Flock's surveillance and data sharing protocols have led a sitting senator to call for the outright removal of Flock cameras from communities.  Senator Ron Wyden of Oregon wrote in a public letter to Flock's CEO that he "conducted further oversight and [] determined that Flock cannot live up to its commitment to protect the privacy and security of Oregonians.  Abuse of Flock cameras is inevitable, and Flock has made it clear it takes no responsibility to prevent or detect that[.]"[23]

---

[20] Electronic Frontier Foundation, *How Cops Are Using Flock Safety's ALPR Network to Surveil Protesters and Activists* (Nov. 20, 2025), https://www.eff.org/deeplinks/2025/11/how-cops-are-using-flock-safetys-alpr-network-surveil-protesters-and-activists.

[21] 404 Media, *ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows* (May 27, 2025), https://www.404media.co/ice-taps-into-nationwide-ai-enabled-camera-network-data-shows/.

[22] 404 Media, *CBP Had Access to More than 80,000 Flock AI Cameras Nationwide* (Aug. 25, 2025), https://www.404media.co/cbp-had-access-to-more-than-80-000-flock-ai-cameras-nationwide/.

[23] Ron Wyden, United States Senator for Oregon, *Wyden Slams Surveillance Tech Company for Ineffective Protections for Oregonians Against Abuses by Federal Agencies and Out-of-State Law Enforcement* (Oct 16, 2025), https://www.wyden.senate.gov/news/press-releases/wyden-slams-

---

47.     Senator Wyden went on to write that he "now believe[s] that abuses of your product are not only likely but inevitable, and that Flock is unable and uninterested in preventing them …. In my view, local elected officials can best protect their constituents from the inevitable abuses of Flock cameras by removing Flock from their communities."[24]

48.     Defendant Flock's breaches of data safety protocols are not limited to giving uncontracted-with federal agencies nationwide access to Americans' data.

49.     Defendant Flock also has a documented track record of failing to adequately protect its camera data from private third parties and unauthorized users.

50.     In November 2025, Senator Wyden and Representative Raja Krishnamoorthi of Illinois called for a federal investigation into Flock after it was revealed that "passwords for at least 35 Flock customer accounts have reportedly been stolen by hackers."[25]

51.     The passwords were stolen in part because "Flock does not require its law enforcement customers to use multi-factor authentication (MFA), a cybersecurity best practice …. In addition, Flock does not natively support phishing-resistant MFA, which is recognized by the federal government as the gold-standard of cyberprotection, and is required of federal agencies."[26]

52.     When asked for comment by tech news periodical *TechCrunch*, Flock responded by sending a letter that said, "the company switched on MFA by default for all new customers starting in November 2024 and that 97% of its law enforcement customers have enabled MFA to date." But that "leaves around 3% of the company's customers — potentially dozens of law enforcement agencies — that have declined to switch on MFA[.]"[27]

surveillance-tech-company-for-ineffective_protections-for-oregonians-against-abuses-by-federal-agencies-and-out-of-state-law-enforcement.

[24] *Id.*

[25] Ron Wyden, United States Senator for Oregon, *Wyden, Krishnamoorthi Urge FTC to Investigate Surveillance Tech Company on Negligently Handling Americans' Personal Data* (Nov. 3, 2025), https://www.wyden.senate.gov/news/press-releases/wyden-krishnamoorthi-urge-ftc-to-investigate-surveillance-tech-company-on-negligently-handling-americans-personal-data.

[26] *Id.*

[27] TechCrunch, *Lawmakers say stolen police logins are exposing Flock surveillance cameras to hackers* (Nov. 3, 2025), https://techcrunch.com/2025/11/03/lawmakers-say-stolen-police-logins-are-exposing-flock-surveillance-cameras-to-hackers/.

53. In January 2026, Flock confirmed that a data breach "exposed live police camera feeds to the internet …. [T]he exposure allowed unauthorized individuals to view live video, access roughly a month of archived footage, and delete video from the system. The breach came to light after concerns were raised about publicly accessible links connected to the company's law enforcement cameras."[28] This data breach involved Flock's "Condor" cameras, which are known as pan-tilt-zoom (PTZ) cameras that are "designed to record and track people, not vehicles."[29]

54. The Condor camera data breach, discovered by a YouTube creator known as Benn Jordan, meant that "without any username, without any password, [viewers could] see[] everything from playgrounds to parking lots with people, Christmas shopping and unloading their stuff into cars."[30]

55. In his interview with *404 Media*, Mr. Jordan stated, "it was the first time that I actually got like immediately scared… I think the one that affected me most was a[] playground. You could see unattended kids, and that's something I want people to know about so they can understand how dangerous this is."[31]

56. A laissez faire attitude towards data security is inherent to—and beneficial for—Flock's business model.

57. In December 2025, a *404 Media* report revealed that Flock "uses overseas workers from Upwork to train its machine learning algorithms, with training material telling workers how to review and categorize footage including images people and vehicles in the U.S."[32]

58. While "[c]ompanies that use AI or machine learning regularly turn to overseas workers to train their algorithms … the nature of Flock's business—creating a surveillance system

[28] Yahoo! News, *Flock Safety Exposese Live Police Camera Feeds in Data Breach* (Jan. 16, 2026), https://www.yahoo.com/news/articles/flock-safety-exposese-live-police-150000641.html.

[29] 404 Media, *Flock Exposed Its AI-Powered Cameras to the Internet. We Tracked Ourselves* (Dec. 22, 2025), https://www.404media.co/flock-exposed-its-ai-powered-cameras-to-the-internet-we-tracked-ourselves/.

[30] *Id.*

[31] *Id.*

[32] 404 Media, *Flock Uses Overseas Gig Workers to Build its Surveillance AI* (Dec. 1, 2025), https://www.404media.co/flock-uses-overseas-gig-workers-to-build-its-surveillance-ai/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

that constantly monitors US residents' movements—means that footage might be more sensitive than other AI training jobs."[33]

59.     This means that Flock, as part of cost-cutting measures, hired freelance and gig workers through a third party, Upwork, to sort through hundreds, if not thousands, of data points that reveal the movements of scores of Americans.

60.     In sum, Flock has a documented history of playing fast and loose with the data of millions of Americans nationally.

**IV.     Defendant Flock Facilitates The Unlawful Sharing Of Californians' Data With Federal And Out-Of-State Agencies**

61.     Flock's inadequate data security protocols extend beyond unauthorized access to its PTZ cameras.

62.     In California, specifically, Flock cameras and their accompanying software have facilitated the sharing of Californians' data with federal agencies and out-of-state agencies numerous times without permission.

63.     Oftentimes, this sharing has occurred even when the local law enforcement agency has, in complying with California law, declined to allow federal access to their ALPR systems.

64.     The municipality of Mountain View, California, "pulled the plug on its entire license plate reader camera network" when it "discovered that Flock Safety, which ran the system, had been sharing city data with hundreds of law enforcement agencies, including federal ones, without permission."[34]

65.     Specifically, "two incidents of unauthorized sharing came to light.  The first was a 'national lookup' setting that was toggled on for one camera at the intersection of the city's Charleston and San Antonio roads.  Flock allegedly switched it on without telling the city."[35]

---

[33] Wired, *Flock Uses Overseas Gig Workers to Build Its Surveillance AI* (Dec. 1, 2025), https://www.wired.com/story/flock-uses-overseas-gig-workers-to-build-its-surveillance-ai/.

[34] Malwarebytes Lab, *Flock cameras shared license plate data without permission* (Feb. 5, 2025), https://www.malwarebytes.com/blog/privacy/2026/02/flock-cameras-shared-license-plate-data-without-permission.

[35] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

66.     The second unauthorized sharing incident involved a "separate 'statewide lookup'" which "had also been active on 29 of the city's 30 cameras since the initial installation, running for 17 straight months until Mountain View found and disabled it on January 5.  Through that tool, more than 250 agencies that had never signed any data agreement with Mountain View ran an estimated 600,000 searches over a single year, according to local paper the *Mountain View Voice*, which first uncovered the issue after filing a public records request."[36]

67.     In Ventura County, "[a] failure in the automated license plate reader system … allowed hundreds of thousands of searches of their data by federal and out-of-state agencies in violation of state law."[37]

68.     In total, the Ventura County Sherriff's Office license plate reader system was accessed "just over 364,000 times."[38]

69.     Specifically, "two out-of-state agencies queried [Ventura Police Department's] system through this vendor-enabled configuration between March and mid-September 2025."[39]

70.     San Francisco and Oakland police have also had their ALPR data, as collected and maintained by Flock, accessed by federal agencies thousands of times.

71.     Journalistic investigation has revealed how "since installing hundreds of plate readers last year, the departments have shared data for investigations related to seven federal agencies, including the FBI.  In at least one case, the Oakland Police Department fulfilled a request related to an Immigration and Customs Enforcement investigation."[40]

72.     Humboldt County, too, has been found to have shared its Flock data with federal

---

[36] *Id.*

[37] VC Star, *Flock license reader flaw opened county's data to non-state agencies* (Feb. 27, 2026), https://www.vcstar.com/story/news/crime/2026/02/27/flock-license-reader-flaw-opened-ventura-countys-data-to-non-state-agencies/88909110007/.

[38] *Id.*

[39] City of Ventura, *Ventura PD finds vendor configuration error; immediately changes department procedures* (Mar. 3, 2026), https://www.cityofventura.ca.gov/Blog.aspx?IID=85.

[40] The San Francisco Standard, *SF, Oakland cops illegally funneled license plate data to feds* (last updated Jul. 17, 2025), https://sfstandard.com/2025/07/14/oakland-san-francisco-ice-license-plate-readers/.

agencies in contravention of California's ALPR regulations.

73.     "Data logs … show that the Sheriff's Office is allowing outside law enforcement agencies to conduct hundreds of thousands of searches per month of its ALPR data, often without first obtaining legally required information such as the reason for the search and the identity of the officer conducting it."[41]

74.     "The data logs reviewed by the *Outpost* also reveal that hundreds of searches were conducted by state and local law enforcement agencies that referenced federal agencies, including Immigrations and Customs Enforcement (ICE), to justify accessing the information."[42]

75.     In El Cerrito, as well, it was discovered that federal agencies still had access to Flock ALPR data despite safeguards being put in place to prevent federal access:

> Following recent news articles about Flock Safety contracts in Richmond and Mountain View, ECPD staff began a comprehensive audit of LPR network usage.  Staff discovered some issues with network use, similar to those reported by other agencies. Staff discovered that during the period between when the first cameras were installed (June 2023) and when ECPD staff took administrative control of the system (August 2023), law enforcement agencies from outside of California were able to search El Cerrito license plate photographs. The federal agencies included the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, and Firearms, the GSA Office of the Inspector General, and the National Park Service. When ECPD assumed control of the system, administrators set data sharing permissions for only non-federal agencies within California ….  **Since August 2023, staff identified two situations in which federal agencies queried the El Cerrito LPR network. Between September 2023 and November 2023, the United States Postal Inspection Service searched for license plates that queried El Cerrito license plate photographs. On two days in May 2025, the Loma Linda Healthcare System Veterans Affairs Police searched for license plates that queried El Cerrito license plate photographs.**[43]

---

[41] Lost Coast Outpost, *The Humboldt County Sheriff's Office Appears to be Violating Its Own Policy and State Law on Automated License Plate Readers* (Oct. 23, 2025), https://lostcoastoutpost.com/2025/oct/23/sheriffs-office-appears-be-violating-its-own-polic/.

[42] *Id.*

[43] Contra Costa News, *El Cerrito Police Issue Statement on Flock License Plate Reading System* (Feb. 27, 2026), https://contracosta.news/2026/02/27/el-cerrito-police-issue-statement-on-flock-license-plate-reading-system/ (emphasis added).

76.　This means that despite local agency (El Cerrito Police Department) control, including the setting of safeguards meant to comply with California law, Flock nevertheless permitted workarounds that facilitated federal agency access to Californians' ALPR data.

77.　Only in response to public outcry and investigative journalism has Flock bothered to implement much needed guardrails to protect Californians' ALPR data. And oftentimes, this implementation was scattershot, incomplete, or explained poorly in order to hide the extent of Flock's complicity in the unlawful surveillance of millions of Americans.

78.　For example, Flock claimed in a June 2025 blog post by its CEO Garrett Langley that "[s]ome states, like California, do not allow any sharing across state borders. For those states, Flock has disabled National Lookup to make compliance easier. And private customers never have access to law enforcement data."[44] The implication was that Flock designed a protocol specifically for California so that Flock was in compliance with Cal. Civ. Code §§ 1798.90.5, *et seq*.

79.　But in August of 2025, a mere two months after that blog post, Flock Safety seemed to walk back its own statements.

80.　In a blog post titled "Ensuring Local Compliance," CEO Garrett Langley wrote, "[w]hile it is true that Flock does not presently have a contractual relationship with any U.S. Department of Homeland Security agencies, we have engaged in limited pilots with the U.S. Customs and Border Protection (CBP) and Homeland Security Investigations (HSI), to assist those agencies in combatting human trafficking and fentanyl distribution. We clearly communicated poorly. **We also didn't create distinct permissions and protocols in the Flock system to ensure local compliance for federal agency users**."[45] This means that Flock's June 2025 statement about disabling the National Lookup feature for California did not mean Flock had implemented data security protocols for Californians' ALPR data.

---

[44] Flock Safety, *Setting the Record Straight: Statement on Flock Network Sharing, Use Cases, and Federal Cooperation* (Jun. 19, 2025), https://www.flocksafety.com/blog/statement-network-sharing-use-cases-federal-cooperation.

[45] Flock Safety, *Ensuring Local Compliance* (Aug. 25, 2025), https://www.flocksafety.com/blog/ensuring-local-compliance (emphasis added).

81.    Flock then went out of its way to detail its chronology of compliance with California Cal. Civ. Code §§ 1798.90.5, *et seq*.  This too would turn out to be insufficient, as Californians' ALPR data was still available to agencies who ought not to have had access.

82.    In a blog post dated January 6, 2026, Flock stated, "In June 2025, Flock also blocked out-of-state agencies from creating new sharing relationships with California agencies."[46]

83.    In that same blog post, Flock also stated, "[i]n July 2025, Flock deployed the Immigration and Reproductive Care search filters for California agencies."[47]

84.    Further, in that same blog post, Flock also stated, "In August 2025, Flock also blocked federal agencies from discovering or requesting sharing relationships with California agencies."[48]

85.    In that same blog post, Flock also noted, "[i]n November 2025 … Flock reviewed sharing relationships with California agencies and, with customer consent, revoked the remaining one-to-one out-of-state shares."

86.    Despite all of Flock's alleged attempts (as detailed in its January 6 blog post) to assume compliance with California's ALPR regulations, Ventura City Police Department revealed that out-of-state agencies still had access to Flock's ALPR system as of mid-September 2025.  *See* paragraphs 67-69, *supra*.

87.    The revelations from El Cerrito Police Department and Ventura City Police Department make clear that even when Flock claims it is finally in compliance with Cal. Civ. Code §§ 1798.90.5, *et seq*., back doors and lax security protocols nevertheless persist, and continue to expose Californians' ALPR data in unlawful ways.

88.    Moreover, even if Flock's January 2026 blog post about its progress towards compliance with Cal. Civ. Code §§ 1798.90.5, *et seq*., were true—and journalistic investigations indicate that it is not—it does not matter.

---

[46] Flock Safety, *Does Flock Share Data With ICE?* (Jan. 6, 2026), https://www.flocksafety.com/blog/does-flock-share-data-with-ice.

[47] *Id.*

[48] *Id.*

89.    Cal. Civ. Code §§ 1798.90.5, *et seq.*, was passed in 2015. Flock's attempts to "catch up" with California's compliance requirements as recently as 2025 mean they are more than a decade late in comply with the law.

90.    In sum, Flock has: (1) allowed federal agencies access to multiple states' Flock's databases without an official, contractual relationship governing that access; (2) failed to implement MFA protections—or allowed end users to reject MFA protections—that resulted in the unauthorized use of multiple users' Flock passwords; (3) hired freelance workers from other countries to sort through millions of Americans' sensitive PII to train its machine learning and/or artificial intelligence systems; (4) failed to implement security protocols that would keep unauthorized third parties (including a YouTube creator) from accessing live feeds of its Condor PTZ cameras; (5) enabled, maintained or allowed data sharing/camera settings across multiple California municipalities' system of Flock cameras to remain "on," resulting in unauthorized federal and out-of-state access to Flock data in the form of hundreds of thousands of searches; (6) failed to make its ALPR policy available to the public in writing in the locations where the cameras were located; and (7) allegedly took steps to comply with Cal. Civ. Code §§ 1798.90.5, *et seq.*, that still resulted in unauthorized access to Californians' ALPR data as late as September 2025, a full ten years after  the ALPR Statute's passage.

91.    Upon information and belief, and based on extensive journalistic investigation, Defendant Flock's history of lax data security protocols and slow-moving compliance initiatives indicate that Flock has failed to safeguard Plaintiff and Class Members' data.  On top of this, they have also failed to make their ALPR policy available to the public in writing as required under Cal. Civ. Code § 1798.90.51(b)(1) and/or Cal. Civ. Code § 1798.90.53(b)(1).

**V.    Plaintiff's Particularized Experience**

92.    Plaintiff Lance Dutcher is acting on his own behalf and on behalf of all others similarly situated.

93.    Plaintiff Dutcher is a citizen of California, residing in Redondo Beach of Los Angeles County, California.  He owns and drives a 2019 Honda Accord.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                18

94.    Plaintiff Dutcher regularly drives in and throughout his home county of Los Angeles along routes where Flock Safety cameras have been installed.  He has driven in Los Angeles for personal and professional purposes, including for work, to visit family and friends, and as a consumer visiting various commercial businesses.  Plaintiff Dutcher has driven on these routes through Los Angeles at all times relevant hereto, including through 2025 and earlier.

95.    Flock's cameras are engineered to photographically capture the license plate information, make and model information, location, and—upon information and belief, even driver/passenger details—of every passing car.  This means that Defendant captured Plaintiff Dutcher's license plate, vehicle, and location data when he drove through Los Angeles, and kept that information.

96.    For instance, Plaintiff parked his vehicle in the parking lot of a Home Depot brick-and-mortar store located at 24451 Crenshaw Blvd., Torrance, California 90505, on September 14, 2025, and more recently in the parking lot of a Home Depot brick-and-mortar store located at 14603 Ocean Gate Ave, Hawthorne, California 90250, on December 10, 2025.  In doing so, Plaintiff's data was obtained by Flock through the Flock Cameras using Flock's ALPR technology, and was subsequently collected, stored, and transmitted at the Home Depot parking lot located at 24451 Crenshaw Blvd. and 14603 Ocean Gate Ave.

97.    At no point during this ongoing capture of Plaintiff Dutcher's information was there a public posting of Flock's ALPR policy made available to Plaintiff Dutcher.

98.    Plaintiff and Class Members had no idea such technology would be tracking them because they do not provide authorization to have their license plates photographed when they drive, and no meaningful notice is given to them anywhere that such cameras are capturing their information.

99.    There were no signs in, on, or around the Flock Cameras that photographed Plaintiff Dutcher indicating that Defendant utilizes ALPRs, or publicizing any other aspect of Flock's usage and privacy policy, which Cal. Civ. Code § 1798.90.51(b)(2) and Cal. Civ. Code § 1798.90.53(b)(2) alike require "shall, at a minimum, include all of the following: (A) The

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

authorized purposes for accessing and using ALPR information. (B) A description of the job title or other designation of the employees and independent contractors who are authorized to access and use ALPR information. The policy shall identify the training requirements necessary for those authorized employees and independent contractors. (C) A description of how the ALPR system will be monitored to ensure the security of the information accessed or used, and compliance with all applicable privacy laws and a process for periodic system audits. (D) The purposes of, process for, and restrictions on, the sale, sharing, or transfer of ALPR information to other persons. (E) The title of the official custodian, or owner, of the ALPR information responsible for implementing this section. (F) A description of the reasonable measures that will be used to ensure the accuracy of ALPR information and correct data errors. (G) The length of time ALPR information will be retained, and the process the ALPR end-user will utilize to determine if and when to destroy retained ALPR information."

100.    The location and license plate data collected by Flock by its ALPR cameras in Los Angeles and throughout California allow those with Flock network access to learn of Plaintiff Dutcher's movements.

101.    CalMatters has found that "some Los Angeles area agencies" have "shared data with ICE or the Border Patrol."[49]  This means that federal agencies have had access to Los Angelenos' (and Californians', generally) ALPR data, including Plaintiff's.

102.    Since Flock has a well-documented history of sharing Californians' ALPR data in contravention of Cal. Civ. Code §§ 1798.90.5 *et seq.*, upon information and belief, Plaintiff Dutcher's location and vehicle data has been viewed or accessed by out-of-state or federal agencies.

103.    Unknown to Plaintiff, at all times that he parked his car in any Home Depot parking lot, among thousands of other places throughout California that feature Flock Cameras, Defendant

---

[49] CalMatters, *LA County moves to limit license plate tracking, citing CalMatters report* (Oct. 10, 2025), https://calmatters.org/economy/technology/2025/10/los-angeles-license-plate-reader-reform/.

utilized its ALPR devices to capture and transfer to a database Plaintiff's license plate number, location, and the amount of time he spent parked in the facility in question.

104.    Defendant obtained and continues to maintain Plaintiff's information which includes his license plate number, and location at the time he passes Flock Cameras.  Thus, the ALPR servers operated by Defendant contained the PII[50] of Plaintiff, and other similarly situated individuals, and Defendant had a legal duty to protect that PII, which it breached.

105.    Plaintiff was injured by Defendant's actions because he suffered invasions of his privacy, as well as a pronounced future risk identity theft, via his ALPR data and suffered a loss of value in his PII and ALPR data.  The ALPR data collected and stored by Flock was obtained without authorization and misused.

106.    Plaintiff, unknowingly, was required to provide his PII in order to park in the Home Depot parking lot, and to park in and/or drive through thousands of other places throughout California that feature Flock Cameras.  If he had known the truth about Defendant's practices, he would not have entrusted his private information to Defendant, or would have at least been afforded an opportunity to make an informed decision about whether and what personal information he would be giving up by driving past Defendant's cameras.

107.    Plaintiff is very concerned about potential identity theft and fraud and the corresponding consequences of such theft or fraud because of improper storage or sharing of his PII.  This fear is compounded by his knowledge that federal agencies and out-of-state agencies have unauthorized access to his PII.

108.    Plaintiff suffered actual injury from having his PII compromised by Defendant including, but not limited to, (a) damage to and diminution of the value of his property interest in his PII; (b) violation of his right to privacy; and (c) imminent and impending injury arising from an increased risk of identity theft and fraud.

---

[50] "'Personal information' means any information that identifies, relates to, describes, or is capable of being associated with, a particular individual … 'Personal information' does not include publicly available information that is lawfully made available to the general public from federal, state, or local government records." (Civ. Code § 1798.8 (e).)

109.    Most ALPR data is sent to law enforcement agencies who use the information to locate stolen vehicles and people with outstanding arrest warrants.  *See generally Automated License Plate Readers*, *supra*.  Thus, the ALPR data taken of Plaintiff's vehicle was transmitted to federal and state law enforcement authorities without a search warrant and not for legitimate purposes.

110.    On information and belief, Defendant agreed to commit the unlawful actions described in this complaint with the intention to defraud and deprive Plaintiff, and similarly situated Class Members of their constitutionally protected rights to privacy, property, and the law.  Defendant committed actions in furtherance of this agreement, consequently causing injury to Plaintiff.

<strong><u>CLASS ALLEGATIONS</u></strong>

111.    ***Class Definition***: Pursuant to Code of Civil Procedure § 382, Plaintiff Dutcher brings this action on behalf of himself and other similarly situated individuals, defined as all individuals in the United States who, during the class period, had their personally identifiable information collected by Flock's ALPR systems while in California without notice, authorization, or consent (the "Class").

112.    Excluded from the Class are governmental entities, Defendant and any entities in which Defendant has a controlling interest, and Defendant's agents, affiliates, parents, subsidiaries, employees, officers, and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

113.    Plaintiff reserves the right to modify or expand the definition of the Class to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

114.    ***Numerosity***: Members of the Class are so numerous that their individual joinder herein is impractical.  On information and belief, the Class includes thousands of consumers.  The precise number of Class Members and their identities are unknown to Plaintiff at this time, but it is

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

estimated to be in the thousands.  Class Members may be notified of the pendency of this action by mail, email, and/or publication.

115.    *Ascertainability*: The proposed class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein because the rights of each proposed class member were infringed or violated in the same fashion.

116.    ***Commonality and Preponderance***: Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members.  These common legal and factual questions include, but are not limited to:

- whether Flock's ALPR policy was publicly posted or conspicuously available in writing in places where the Flock Cameras are installed or maintained;
- whether Defendant failed to maintain reasonable security procedures and practices that would prevent images and/or the PII of Plaintiff and Class Members from being shared and disseminated to federal and out-of-state agencies;
- whether Defendant's conduct violated the Civil Code § 1798;
- whether Plaintiff and Class Members have been harmed and the proper measure of relief; and
- whether Plaintiffs and the Class are entitled to attorney's fees and costs.

117.    *Typicality*: Plaintiff's claims are typical of the claims of the proposed Class he seeks to represent because Plaintiff, like all members of the Class, were induced by the Defendant's lack of notice of the utilization of ALPR systems and subsequently: (1) used or accessed parking amenities at multiple Home Depot parking lots in California, and (2) drove through many other locations throughout California that feature Flock Cameras without knowing that Defendant would collect his PII.  The representative Plaintiff, like all members of the Class, has been injured by the Defendant's misconduct in the very same way as the members of the Class.  Further, the factual bases of the Defendant's misconduct are common to all members of the Class and represent a common thread of misconduct resulting in injury to all members of the Class.

118.    *Adequacy*: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

119.    *Superiority*: A class action is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also represents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

120.    Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

121.    Without a class action, Defendant will continue a course of action that will result in further damages to the Plaintiff and Members of the Class and will likely retain the benefits of wrongdoing.

122.    Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**Violation of California Civil Code §§ 1798.90.5 *et seq.***
(By Plaintiff, Individually and on Behalf of All Class Members, Against Defendant)

123.    Plaintiff hereby incorporates by reference the allegations contained in all proceeding paragraphs of this complaint as though alleged in this Count.

124.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

125.   Plaintiff Lance Dutcher is a natural person and thus, an "individual" pursuant to § 1798.90.54.

126.   Defendant is a "person" pursuant to § 1790.90.5(e) because it is a "corporation."

127.   Pursuant to § 1798.90.51, an ALPR operator shall:

(a) Maintain reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure.

(b)(1) Implement a usage and privacy policy in order to ensure that the collection, use, maintenance, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties.  The usage and privacy policy shall be available to the public in writing, and, if the ALPR operator has an Internet Web site, the usage and privacy policy shall be posted conspicuously on that Internet Web site.

(2) The usage and privacy policy shall, at a minimum, include all of the following:

(A) The authorized purposes for using the ALPR system and collecting ALPR information.

(B) A description of the job title or other designation of the employees and independent contractors who are authorized to use or access the ALPR system, or to collect ALPR information.  The policy shall identify the training requirements necessary for those authorized employees and independent contractors.

(C) A description of how the ALPR system will be monitored to ensure the security of the information and compliance with applicable privacy laws.

(D) The purposes of, process for, and restrictions on, the sale, sharing, or transfer of ALPR information to other persons.

(E) The title of the official custodian, or owner, of the ALPR system responsible for implementing this section.

(F) A description of the reasonable measures that will be used to ensure the accuracy of ALPR information and correct data errors.

(G) The length of time ALPR information will be retained, and the process the ALPR operator will utilize to determine if and when to destroy retained ALPR information.

128.    Pursuant to § 1798.90.53, an ALPR end-user shall:

(a) Maintain reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure.

(b)(1) Implement a usage and privacy policy in order to ensure that the access, use, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties. The usage and privacy policy shall be available to the public in writing, and, if the ALPR end-user has an Internet Web site, the usage and privacy policy shall be posted conspicuously on that Internet Web site.

(2) The usage and privacy policy shall, at a minimum, include all of the following:

(A) The authorized purposes for accessing and using ALPR information.

(B) A description of the job title or other designation of the employees and independent contractors who are authorized to access and use ALPR information. The policy shall identify the training requirements necessary for those authorized employees and independent contractors.

(C) A description of how the ALPR system will be monitored to ensure the security of the information and compliance with applicable privacy laws and a process for periodic system audits.

(D) The purposes of, process for, and restrictions on, the sale, sharing, or transfer of ALPR information to other persons.

(E) The title of the official custodian, or owner, of the ALPR information responsible for implementing this section.

(F) A description of the reasonable measures that will be used to ensure the accuracy of ALPR information and correct data errors.

(G) The length of time ALPR information will be retained, and the process the ALPR end-user will utilize to determine if and when to destroy retained ALPR information.

129.    Defendant Flock is an "ALPR Operator" pursuant to § 1798.90.5(c) because it and those it is comprised of "operate" an ALPR system.

130.    Defendant Flock is also an "ALPR end-user" pursuant to § 1798.90.5(a) because it and those it is comprised of "access[] or "use[] an ALPR system."

131.    As an ALPR Operator, Defendant did not maintain "reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect

ALPR information from unauthorized access, destruction, use, modification, or disclosure" in violation of § 1798.90.51(a). This lack of reasonable security procedures and practices resulted in unlawful access—as detailed in well-documented, journalistic investigations—of Californians' ALPR data by federal and out-of-state agencies.

132.    As an ALPR end-user, Defendant did not maintain "reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure" in violation of § 1798.90.53(a). This lack of reasonable security procedures and practices resulted in unlawful access—as detailed in well-documented, journalistic investigations—of Californians' ALPR data by federal and out-of-state agencies.

133.    Moreover, as an ALPR Operator, Defendant does not have a policy compliant with each required element under § 1798.90.51(b)(1). This is because Defendant: (1) fails to collect, share and disclose Defendant's use of ALPR information consistent with Plaintiff's right to privacy and civil liberties; and (2) does not furnish a usage and privacy policy to the public in writing near its cameras.

134.    Specifically, as an ALPR Operator, Defendant has an extensive history of failing to ensure Californians' ALPR information remains protected. Instead, in a manner inconsistent with Plaintiff's right to privacy and civil liberties, Defendant actively collects and discloses—or fails to stop the disclosure of—Californians' ALPR information to federal and out-of-state agencies. Defendant also does not put Californians on written, public notice of its ALPR usage policy, because there is no indication anywhere near its ALPR cameras that Plaintiff and Class Members' PII is being captured, stored, or disseminated.

135.    Moreover, as an ALPR end-user, Defendant does not have a policy compliant with each required element under § 1798.90.53(b)(3). This is because Defendant fails to: (1) implement a "usage and privacy policy in order to ensure that the access, use, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties"; and (2) does not furnish a usage and privacy policy to the public in writing near its cameras.

136. Specifically, as an ALPR end-user, Defendant has an extensive history of failing to ensure Californians' ALPR information remains protected. Instead, in a manner inconsistent with Plaintiff's right to privacy and civil liberties, Defendant actively shares or disseminates—or fails to stop the dissemination of—Californians' ALPR information to federal and out-of-state agencies. Defendant also does not put Californians on written, public notice of its ALPR usage policy, because there is no indication anywhere near its ALPR cameras that Plaintiff and Class Members' PII is being captured, stored, or disseminated.

137. Flock did not design or implement security measures that would protect Plaintiff and Class Members' PII from being disseminated to federal and out-of-state agencies. In fact, even after Flock expressly claimed that steps were taken to bring certain municipalities' Flock systems into compliance with California Civil Code §§ 1798.90.5 *et seq.*, those municipalities nevertheless discovered ongoing, unauthorized access to their ALPR data. See paragraphs 75-87, *supra*.

138. Plaintiff was also "harmed" for the reasons incorporated and alleged herein. Defendant's conduct was knowing, willful, and/or reckless when they collected, used, accessed and shared his ALPR information without authorization.

139. Pursuant to § 1798.90.54(a), Plaintiff is entitled to, and requests "any other sanctions, penalties, or remedies provided by law," and requests pursuant to § 1798.90.54(b) a combination of any one or more of the following:

(1) actual damages, but not less than liquidated damages in the amount of two thousand five hundred dollars ($2,500).

(2) Punitive damages upon proof of willful or reckless disregard of the law.

(3) Reasonable attorney's fees and other litigation costs reasonably incurred.

(4) Other preliminary and equitable relief as the court determines to be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgement against Defendant, as follows:

(a) For an order certifying the Class and naming Plaintiff's attorneys as Class Counsel

to represent the members of the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury but no less than $2,500 for each violation of Civil Code § 1798;

(d)     For prejudgment interest on all amounts awarded;

(e)     For punitive and exemplary damages

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For an order requiring Flock to undertake a corrective action;

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit; and

(i)     Granting such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: March 4, 2026                          Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _____
        Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
Julia K. Venditti (State Bar No. 332688)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com
            jvenditti@bursor.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                          29